**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SHANA NIZEUL,<br>Individually and on behalf of others similarly situated,<br>*Plaintiff*,<br><br>v.<br><br>ICF TECHNOLOGY, INC., ACCRETIVE TECHNOLOGY GROUP, INC.,<br>*Defendants*. | No. 3:24-cv-1393 (MPS) |

## RULING ON MOTION FOR CLASS CERTIFICATION

I.    **Introduction**

Plaintiff Shana Nizeul ("Nizeul") brings this action against ICF Technology, Inc. ("ICF") and Accretive Technology Group, Inc. ("ATG," and collectively with ICF, "Defendants"). Nizeul performs live video content for customers on Streamate.com ("Streamate"), an adult chat website owned and operated by Defendants. Under Defendants' policies, Nizeul and others who perform on Streamate ("Performers") are not paid for the entire time they spend live streaming. Nizeul has sued, alleging that Defendants misclassify her and other Performers as independent contractors and thereby deny her wages owed under the Fair Labor Standards Act ("FLSA") and the Connecticut Minimum Wage Act ("CMWA"). She also brings a statutory theft claim under Connecticut law, alleging that Defendants unlawfully retain sixty-five percent of discretionary tips paid by customers during Performers' livestreams. Nizeul now seeks to represent a putative class of Performers for her Connecticut law claims. ECF No. 60-1. For the reasons explained below, Nizeul has satisfied the requirements of Rule 23, and the Motion for Class Certification will be granted.

## II.      Factual Background

The following facts are drawn from the operative complaint, Defendants' answer, the parties' briefs on the Plaintiffs' motion for class certification, and the accompanying affidavits and exhibits. I set forth only those facts necessary to decide the motion.

### 1)   *Streamate and Its Performers*

Defendant ICF operates Streamate, a website that hosts live adult entertainment for customers. ECF No. 42 at 3. Defendant ATG wholly owns ICF. ECF No. 42 at 1. Plaintiff alleges that both entities jointly employ her and other Performers who provide live performances on Streamate. ECF No. 41 ¶ 4.

To begin livestreaming on Streamate, each Performer must apply to and be approved by Defendants. ECF Nos. 60-1 at 10; 71-1 ¶ 3. Performers must certify their eligibility by confirming their compliance with minimum age requirements and the legal right to perform adult-oriented content in their place of residence. ECF No. 71-1 ¶ 3. Defendants review each application and verify Performer eligibility. ECF No. 60-4 at 3. Each Performer must also sign a Performer Agreement in order to begin streaming or uploading content. ECF No. 42 at 4. The Performer Agreement sets the rules for streaming and states that Performers "shall not be deemed or treated as an employee of Streamate for any purpose." ECF Nos. 71-5 at 4; 60-4 at 2, 8.

### 2)   *"Free Chat" and "Paid Chat"*

Streamate organizes a Performer's livestreams into two modes: "free chat" and "paid chat." ECF No. 71-1 ¶¶ 4–6. Customers visiting the site can browse thumbnails of Performers currently online and select a stream to join. ECF Nos. 60-1 at 15; 60-14 at 2–4. Upon entering a stream, customers are placed in free chat, where they can view the Performer's live video and interact with them at no charge. ECF No. 71-1 ¶ 5. A customer can enter a paid chat by paying a per-minute or

flat rate. *Id.* ¶ 6; ECF No. 41 ¶¶ 13, 38. When a Performer is in a paid chat, non-paying customers are no longer able to view the stream. ECF No. 71-1 ¶ 6. Once the paid session concludes, the Performer returns to free chat. ECF No. 60-1 at 15.

Performers can earn revenue while streaming in both free and paid chat through "Gold" transactions. ECF No. 41 ¶ 14. Gold is Streamate's virtual currency; one Gold is equal to one U.S. dollar. ECF No. 71-1 ¶ 5, n. 1. Gold can be used by customers to purchase a Performer's previously uploaded photos or videos or to subscribe to the Performer's content. *Id.* ¶ 5; ECF No. 60-6 at 18. Customers can also give discretionary one-time Gold payments during a Performer's livestream to "show extra appreciation" as a "bonus." ECF No. 41 ¶ 14; *see also* ECF Nos. 60-9 at 2 ("Receive tips on Streamate with Gold! . . . Gold is used as a mode for members to 'tip' models on Streamate."); 60-7 at 30 (Defendants' corporate representative testifying that customers may give Performers Gold on Streamate "at their own discretion" and that "[t]he term 'tip' is common vernacular in the performer population"). Nizeul asserts that these kinds of Gold transactions are tips. Defendants disagree. Performers can use features during their streams, such as the "Gold Menu" or "Spin the Wheel," to solicit discretionary Gold payments. ECF No. 71-1 ¶ 5. Under the Gold Menu, a Performer can agree to perform a specific Menu item once they receive a set amount of Gold. *Id.; see also* ECF No. 72-2 at 4–10 (Nizeul testimony on using the Gold Menu to solicit tips). Under the Spin the Wheel function, a customer pays an amount set by the Performer to spin a digital wheel, and the Performer then performs the act that the wheel lands on. ECF No. 71-1 ¶ 5.

Defendants admit that they do not pay Performers for time spent in free chat. ECF No. 42 ¶ 18. Defendants track each Performer's total minutes online (free chat plus paid chats) and total paid minutes online (paid chats only) and compensate them only for the latter. ECF No. 42 ¶¶ 18–

19. Gold transactions are, therefore, the only way a Performer can earn money while in free chat. ECF No. 71-1 ¶ 5. Performers and Streamate share all revenue derived from Gold transactions during a Performer's livestream. ECF Nos. 42 ¶ 35; 60-4 at 5. Under the typical revenue split, Streamate receives sixty-five percent of the Gold a Performer earns, and the Performer retains thirty-five percent. ECF No. 60-7 at 13.

### 3)  *Written Rules and Policies*

Each Performer is bound by the rules for using Streamate as set out in the Performer Agreement, which Defendants may terminate for any reason. ECF No. 60-4 at 2, 8. Defendants can suspend or terminate a Performer's livestream or Streamate account for violating the terms of the Agreement. *Id.* at 3–4. For example, Performers are prohibited from displaying "below the waist" nudity in free chat areas and from promoting any non-Streamate websites. *Id.* at 6. Individuals who are not Streamate-approved Performers may not appear in performances even if they meet the minimum age requirement. *Id.* Performers are not permitted to use or be under the influence of illegal drugs or alcohol in any of their content, solicit prostitution, or display any animals, firearms, or guns of any type. *Id.* The Agreement also prohibits "fraudulent activity," defined as "any activity that violates any law, that results in complaints or chargebacks, or that is deemed inappropriate by [Defendants]." *Id.* Defendants can amend the terms of the Performer Agreement at any time in their sole discretion. *Id.* at 10.

Defendants review all content submitted for upload before it becomes publicly viewable and may block any content deemed to violate the Performer Agreement. *Id.* at 4. Defendants must pre-approve any images the Performer submits for their website biography. ECF No. 42 at 5. Defendants also actively monitor Performer conduct in real time throughout each livestream and

block or remove any livestreamed content they determine to be in violation of the Performer Agreement. ECF No. 60-4 at 3–5.

Streamate also provides Performers a "Streaming Rules FAQ," which clarifies its "streaming rules and how they are enforced." ECF No. 60-12 at 2. Defendants categorize their rules as "no tolerance rules," "three-strike rules," and behavior that is "allowed with some exceptions." *Id.* at 2-9. A violation of a "no tolerance rule" results in removal from Streamate for the first violation. *Id.* at 2. "No tolerance" rules include the prohibitions on underage and non-consensual roleplay, weapons, and drug use. *Id.* at 3-5. Violations of Streamate's "three-strike rules" will result in a warning or temporary suspension, but a third violation will result in the Performer's removal from Streamate. *Id.* at 5. "Three-strike" rules include prohibitions on streaming under the influence and pets on camera. *Id.* at 6.

### 4) Plaintiff's Experience

Plaintiff Shana Nizeul has performed on Streamate from her residence in Dayville, Connecticut, since March 2022. ECF No. 41 ¶¶ 1, 11. Nizeul has worked in free chat—performing on camera to attract customers to paid sessions—without compensation for that time. *Id.* ¶¶ 36–37. Because Defendants only compensate Performers once a customer joins a paid session, Nizeul has received pay for only a fraction of her total hours worked. *Id.* ¶¶ 38–40. Nizeul has also been affected by Defendants' withholding of Gold. *See id.* ¶ 35. For example, during the week of December 4, 2022, she earned $185.00 in discretionary Gold transactions during her performances, yet she only retained approximately $64.75, or thirty-five percent of her tips. *Id.* ¶ 120.

### III.    Procedural History

On August 29, 2024, Nizeul filed an initial Complaint on behalf of herself and all others similarly situated against Defendants. ECF No. 1. On February 7, 2025, Nizeul filed the operative

First Amended Complaint. ECF No 41. Nizeul alleges that Defendants misclassify Performers as independent contractors under their Performer Agreements and thereby violate the FLSA and CMWA by failing to pay Performers wages owed for time spent streaming in free chat. *Id.* ¶¶ 4, 60, 100. She also claims that Defendants have committed statutory theft under Connecticut law by retaining sixty-five percent of discretionary Gold transactions, properly classified as tips, earned by a Performer while streaming. *Id.* ¶ 35, 121.

On August 21, 2025, Nizeul moved for class certification under Federal Rule of Civil Procedure 23 for her claims under Connecticut law. ECF No. 60. She seeks to represent a class of "all persons who, at any time from August 29, 2021 continuing through entry of judgment in this case, worked as Performers for [Defendants] in Connecticut and were classified as independent contractors under their Performer Agreements." *Id*. at 1. Defendants oppose certification. *See* ECF No. 71.

## IV.    Legal Standard

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. The party seeking certification must satisfy the requirements set forth in Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These prerequisites are referred to as 'numerosity, commonality, typicality, and adequacy of representation.'" *Martinez v. Avantus, LLC*, 343 F.R.D. 254, 261 (D. Conn. 2023) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013)). The

Second Circuit "has also 'recognized an implied requirement of ascertainability in Rule 23.'" *In re Petrobras Securities*, 862 F.3d 250, 260 (2d Cir. 2017).

"Certification of the class must also be deemed appropriate under one of the three subdivisions of Rule 23(b)." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010). Nizeul seeks certification under Rule 23(b)(3), therefore, she must show: "(1) that 'the questions of law or fact common to class members predominate over any questions affecting only individual members' (the 'predominance' requirement); and (2) that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy' (the 'superiority' requirement)." *In re Petrobras Securities*, 862 F.3d at 260 (quoting Fed. R. Civ. P. 23(b)(3)).

The party seeking class certification bears the burden of establishing each of Rule 23's requirements by a preponderance of the evidence. *Amara v. CIGNA Corp.*, 775 F.3d 510, 519 (2d Cir. 2014). In determining whether a proposed class meets these requirements, the court must resolve any factual disputes and find any facts relevant to this determination. *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 41 (2d Cir. 2006).

## V.    Discussion

I find that the proposed class satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements; the Second Circuit's ascertainability requirement; and Rule 23(b)(3)'s predominance and superiority requirements.

### A. Rule 23(a)

#### 1) Numerosity

Rule 23(a) requires a showing that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "[n]umerosity is presumed for classes larger than forty members." *Pennsylvania Pub. Sch. Employees' Ret. System v. Morgan*

*Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014). "Defendants concede that Plaintiff meets the requirements of numerosity," ECF No. 71 at 14 n.3, and based on Defendants' timekeeping and payroll records, Nizeul estimates that the proposed class includes approximately 132 Performers. ECF No. 60-1 at 20. Therefore, the numerosity requirement is satisfied.

### 2) *Commonality and Typicality*

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is satisfied where class members "have suffered the same injury," meaning their claims "must depend upon a common contention . . . [where] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks omitted). "In other words, the relevant inquiry is whether a classwide proceeding is capable of generating common answers apt to drive the resolution of the litigation." *Jacob v. Duane Reade, Inc.*, 602 Fed. Appx. 3, 6 (2d Cir. 2015) (internal quotation marks, alteration, and citation omitted). The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

Nizeul's claims present four questions common to all class members: (1) whether Performers are misclassified as independent contractors rather than employees; (2) whether Defendants violated the CMWA by failing to pay Performers minimum and overtime wages for all hours worked; (3) whether discretionary payments in Gold earned during Performers' livestreams constitute tips (rather than payments for services); and (4) whether Defendants unlawfully retained Performers' Gold. *See* ECF No. 60-1 at 21. Defendants argue that

commonality is not satisfied because, in order to prove that the Performers were correctly classified as independent contractors, individual inquiries are necessary to determine the level of control Defendants exercise over the Performers' work.[1] ECF No. 71 at 18. They focus on the terms of the Performer Agreements to argue that they are not sufficiently indicative of employer control. *Id.* at 19–25. This argument goes to the merits, however, and ultimately supports Plaintiff's position that the Court can resolve the question of whether Defendants were employers on a common basis by studying the terms of the Agreements. The alleged class injuries arise from the same legal theory: Defendants have improperly classified the Performers as independent contractors under their Performer Agreements[2] and Defendants' uniform compensation practices

---

[1]    The parties agree that Nizeul's misclassification claim is governed by Connecticut's "ABC" test for employment status under Conn. Gen. Stat. § 31-222(a)(1)(B)(ii). ECF Nos. 60-1 at 8–9, 26–27; 71 at 18. This test is discussed in more detail below in the predominance section. For the purposes of commonality, Defendants assert that the first prong of the test, which requires a putative employer to show that an alleged employee "has been and will continue to be free from control and direction in connection with the performance of such service," Conn. Gen. Stat. § 31-222(a)(1)(B)(ii), cannot be satisfied by common evidence. ECF No. 71 at 17–18. For the reasons set forth in the predominance section, I disagree.

[2]    The Court notes that only one version of the Performer Agreement is attached to the parties' briefs. *See* ECF Nos. 60-4 at 2–10; 71-3 at 2–10. This version of the agreement appears to have been updated in 2024, *id.* at 2, and therefore may not have been the same contract all Performers signed when they began streaming on Streamate. *See* ECF No. 60 at 1 (seeking to certify class of persons "who, from any time from August 29, 2021…worked as Performers…"). Neither party raises this issue in their briefs. *See* ECF Nos. 60-1 at 10, 26 ("These Performer Agreements are nearly identical for all Performers"; "…whether the Performers who signed the same (or nearly the same) agreement…"); 71 at 19 (arguing that "the Performer Agreement…does not exert employer-like control" in response to "Plaintiff['s] assert[ion] that the 'nearly the same' agreements that performers sign provide '[c]ommon evidence' as to the control Defendants exert over performers.").

There is also evidence in the record that all Performers did sign substantially the same Performer Agreement. *See* ECF Nos. 71-5 at 3-4 ("Q. Has the list [of rules in the Performer Agreement] been updated since your time at Accretive? A. I cannot speak . . . specifically on that issue. I don't think the fundamental categories have changed . . . . . Q. So, the Performer Code of Conduct in conjunction with the Performer Agreement sets forth all the rules that are applicable to performers on Streamate? A. Yes."); 60-5 at 13 ("But they all do receive a Performer Agreement? A. Correct. Q. When do they receive it? A. On sign up and if it changes. . . . Q. And does the performer or prospective employer have to execute this document in order to stream on Streamate? A. Yes. Q. And does the agreement in place at the time of signup apply uniformly to all performers? A. Yes. Q. And it applies uniformly regardless of where the prospective employer is signing up from? A. Yes.").

Therefore, for the purposes of this motion, I find that the Performer Agreement—as of 2024 or earlier versions—is common evidence of the relationship between Performers and Defendants. *Accord Tomasello v. ICF Tech., Inc.*, 2025 WL 1177718, at *11 (D.N.J. Apr. 23, 2025) ("common evidence can

deny them wages (including tips) owed. *See Montiel-Flores v. JVK Operations Ltd.*, 2023 WL 6057375, at *3 (E.D.N.Y. Sept. 18, 2023) ("In wage cases, the commonality requirement is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices.").

As for typicality, Nizeul and the putative class advance the same theory of liability for the classwide claims: Defendants exercised sufficient control over Performers' streams to render Performers employees (rather than independent contractors) such that they are entitled to minimum wages for all time spent streaming and the full amount of discretionary customer tips paid to them in Gold. ECF No. 60-1 at 23–24. Defendants' arguments against typicality are similarly merit-based. They point to testimony from Performers stating that the thirty-five percent of the Gold they received while streaming in the free chat exceeds what they would have received if they had been paid the minimum wage for time spent streaming in free chat. ECF No. 71 at 15. This evidence presents a defense to damages liability for wage violations under the CMWA but does not defeat typicality. Whether Defendants owed Nizeul a minimum wage for her time spent in the free chat and whether the Gold payments were tips that were entirely hers to keep are questions common to all class members, and Nizeul and the class members will make similar arguments to sway the Court's resolution of those questions. Accordingly, the commonality and typicality requirements are satisfied.

---

answer whether Performers were contractually free from Defendants' control. All Performers are required to execute a Performer Agreement, which governs the Performers' relationship with Defendants and are largely uniform across the six versions provided to the Court.") *and Mondello v. ICF Tech., Inc.*, 2025 WL 2223115, at *4 (M.D. Fla. Jan. 16, 2025) ("According to Plaintiff, Defendants have produced nine versions of their standard agreement in this and the New Jersey litigation, all of which appear to be substantially the same At its root, the Performer Agreement defines the relationship between performers and Defendants, classifies every performer as an independent contractor subject to the same compensation structure (i.e., no hourly compensation for time in free chats), and includes the rules a performer must follow to remain on the platform—all evidence common to the collective.").

### 3) *Adequacy*

Rule 23(a)'s adequacy requirement ensures that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry examines whether: "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). The central concern is "uncovering conflicts of interest between named parties and the class they seek to represent." *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks and citations omitted). Only conflicts that are "fundamental" will defeat a motion for certification. *Id.*

Nizeul contends, and I agree, that there is no evidence of any conflict of interest between her and members of the class. Defendants argue that Nizeul's interests are misaligned with the proposed class with respect to her claim that Performers have been misclassified as independent contractors. ECF No. 71 at 16–17. They rely on Nizeul's deposition testimony that she was "not sure" she would have worked on the Streamate platform if she were required to be classified as an employee. ECF No. 70 at 18. Defendants also point to testimony of other Performers who stated that they prefer the freedom independent contractor status provides. ECF No. 71 at 16–17. Nizeul's statement, read in context, however, reflects that her response to the question of employment status depended on various hypothetical factors, including compensation, control over working conditions, and access to her clients. ECF No. 72-2 at 11–12 ("There are too many factors for me to answer that. . . . Would they direct the flow of traffic? Would I make the same kind of money if I worked those hours? Am I going to get my clients? . . . [T]here is about a billion factors"). So her answer does not show that she is not interested in being compensated as an employee or that

11

she cannot represent a class of persons who seek to be treated as employees. Further, the fact that some Performers enjoy what they understand as benefits of being classified as an independent contractor, such as flexible working hours, does not amount to a fundamental conflict of interest between Nizeul and the class. The Defendants concede that Nizeul's counsel is adequate. ECF No. 71 at 14 n.3 ("Defendants concede that Plaintiff meets the . . . adequacy of counsel's representation"). Accordingly, I find that the adequacy requirement is satisfied.

## B. Ascertainability

Having found that the proposed class meets all four of the Rule 23(a) requirements, I turn to the Second Circuit's requirement that the class definition be "ascertainable." The ascertainability requirement imposes a "modest threshold," *In Re Petrobras Sec.*, 862 F.3d at 269, and "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *Id.* at 264. The analysis is "limited to [the] narrow[] question of whether th[e] determination [of who is in the class is] objectively *possible*." *Id*. at 270 (emphasis in original). Certification will only be precluded "if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269.

The proposed class includes individuals who (1) worked for Defendants in Connecticut, (2) under a Performer Agreement classifying them as independent contractors, (3) between August 29, 2021, and the entry of judgment. ECF No. 60-1 at 19–20. Class membership can easily be determined through timekeeping and payroll records already produced by Defendants. *Id.* Further, the Defendants do not contest certification on the grounds of ascertainability. *See* ECF No. 71 (briefing only issues of typicality, adequacy, commonality, predominance, and superiority). Accordingly, the proposed class is ascertainable.

## C. Rule 23(b)(3)

Since I have found that Nizeul's proposed class satisfies the requirements of Rule 23(a) and the implied requirement of ascertainability, I now must determine whether it satisfies one of the subsections of Rule 23(b). Nizeul seeks certification under Rule 23(b)(3), which requires her to demonstrate "(1) that 'the questions of law or fact common to class members predominate over any questions affecting only individual members' and (2) that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *In re Petrobras Securities*, 862 F.3d at 260 (quoting Fed. R. Civ. P. 23(b)(3)).

### 1) *Predominance*

To satisfy Rule 23(b)(3), the party seeking certification must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether [the] proposed class[] is sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Although similar to Rule 23(a)'s commonality requirement, predominance is "more demanding." *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir. 2002).

"The predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig*., 729 F.3d 108, 118 (2d Cir. 2013) (internal quotation marks and citation omitted). It is not necessary that each element of the plaintiff's claims be susceptible to classwide proof, but that "common questions *predominate* over any questions affecting only individual [class] members." *Amgen Inc. v. Connecticut Ret. Plans*

*and Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks omitted; emphasis and alteration in original).

As discussed above, Nizeul's claims under the CMWA turn principally on whether Defendants misclassified Performers as independent contractors under Connecticut law, and, if so, whether Defendants failed to pay wages owed for all hours worked. Her claim for unlawfully withheld tips turns on whether certain customer payments in Gold constitute discretionary tips belonging to the Performers. The Court will analyze each of Nizeul's claims in turn to consider whether the legal or factual issues they present can be resolved by generalized proof.

### a.  Misclassification – ABC Test

The parties agree that the Court should apply Connecticut's statutory definition of "employment" under Conn. Gen. Stat. § 31-222(a)(1)(B)(ii) to determine whether Nizeul and other class members are employees or independent contractors of Defendants. ECF Nos. 60-1 at 8–9, 26–27; 71 at 18. This statutory provision is commonly referred to as the "ABC" test. *Sw. Appraisal Grp., LLC v. Adm'r, Unemployment Comp. Act*, 324 Conn. 822, 823 & n.1 (2017). The statute imposes a presumption that a worker is an employee covered by the protections of the CMWA "unless and until" the putative employer establishes the following three factors:

> A. that "such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact"; and
>
> B. that "such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed"; and
>
> C. that "such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

*Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204, 209 (2d Cir. 2021) (quoting Conn. Gen. Stat. § 31-222(a)(1)(B)(ii)). The statute is written in the conjunctive: "unless the party claiming the exception

14

to the rule that service is employment shows that all three prongs of the test have been met, an employment relationship will be found." *Sw. Appraisal Grp., LLC v. Adm'r, Unemployment Comp. Act*, 324 Conn. 822, 832 (2017). In other words, if Defendants fail to prove any single prong, the Court will find Nizeul is an employee.

The determination as to prong A will hinge on common evidence. All class members were required to execute substantially similar Performer Agreements before they began performing on Streamate. ECF No. 60-1 at 26–27. These standardized agreements impose restrictions on the content Performers may publish on Streamate and authorize Defendants to monitor, block, and remove live or uploaded content that violates those restrictions. ECF No. 60-4 at 3–5. The Agreements also permit discipline for noncompliance, including warnings, suspensions, and account termination. *Id.*; *see also* ECF No. 60-12 at 2–6. Several restrictions extend beyond legal compliance. For example, Performers may not display "below the waist nudity" in free chat areas, depict even their pets on screen, use alcohol while filming, or promote "non-Streamate related website[s]." ECF 60-4 at 6. Further, Defendants can block the Performer's stream, and discipline the Performer, for any activity they deem "inappropriate." ECF No. 60-4 at 6. And Defendants' enforcement of these restrictions, as explained by the "Streaming Rules FAQ," provides evidence common to all Performers of how Defendants "in fact" exercised control. ECF No. 60-12 at 2.

Defendants contend that prong A cannot be resolved by common evidence because the Performer Agreements cannot demonstrate employment-like control. ECF No. 71 at 19. Defendants' argument is that, subject to Streamate's policies and the Performer Agreement, Defendants have no control over what the Performers wear; what customers ask them to do; how Performers interact with customers; and what Performers do when they stream. *Id.* Again, this is an argument about the merits and does not show that the issue of control cannot be resolved—one

way or another—on the basis of common evidence. Because all Performers were subject to the same contract (and other of Defendants' policies), whether they were free from control and direction depends on common evidence of the same contractual relationship that governed each Performer's relationship with Defendants.

Prong B is also capable of resolution with common evidence. This factor examines whether the services performed fall outside the usual course of the putative employer's business. Defendants operate a platform wherein Performers, like Nizeul, can stream live adult content on the internet. ECF No. 42 ¶ 48. Whether the streaming services provided by Performers fall within the usual course of that business is not Performer-specific but depends in large part on Defendants' business model generally. *See* ECF No. 60-1 at 14–15 (ICF describes itself as a "world leading player in the live streaming technology field" and that "developing streaming services" is "one of its core businesses"; ATG describes itself as a "market leader in web-based live video streaming"). Therefore, I find that prong B is capable of resolution on a classwide basis.

Finally, prong C asks, "whether the person engaged in covered employment actually has such an independent business, occupation, or profession, not whether he or she could have one*."* *Kirby of Norwich v. Adm'r, Unemployment Comp. Act*, 328 Conn. 38, 50 (2018) (internal quotation marks and citation omitted). Although this factor considers the Performers' actual business status, Defendants have not shown that materially different proof would be required on a Performer-by-Performer basis. Moreover, the availability of Streamate as the exclusive host for the Performers' content is a matter of generalized proof common to all class members. *See Tomasello v. ICF Tech., Inc.*, 2025 WL 1177718, at *14 (D.N.J. Apr. 23, 2025) (finding prong C susceptible to common proof in a companion case under New Jersey's similar "ABC" test because Performers "depend on Streamate for its hosting services and cannot maintain employment without said hosting

services"); *id.* (noting that "technological capabilities" required for streaming "are largely unavailable to Performers once their working relationship is terminated"). Thus, individualized inquiries do not predominate with respect to prong C.

Accordingly, I find that application of the "ABC" test is capable of adjudication through common evidence and that common issues predominate with respect to Nizeul's misclassification claim.

### b.  Unpaid Wages and Unlawfully Withheld "Tips"

Nizeul claims that as a result of misclassification, Defendants have failed to pay minimum wages and overtime due for Performers' time spent streaming in "free chat." ECF No. 60-1 at 15. She also claims that Defendants have unlawfully retained sixty-five percent of the discretionary Gold Performers earned while livestreaming. ECF No. 60-1 at 16. To prevail on her CMWA claims, she must establish that Defendants paid her less than the minimum wage or, where applicable, overtime wage for all hours worked. Conn. Gen. Stat. § 31-60. Her gratuity-related claims depend on whether certain Gold transactions constitute discretionary tips because, under Connecticut law, tips paid to employees are treated as wages that can only be withheld in certain limited circumstances. *See* Conn. Agencies Regs. § 31-222-5a ("Whenever tips or gratuities are paid directly to an employee by a customer of an employer, the amount thereof which is accounted for by the employee to the employer shall be considered wages"); Conn. Gen. Stat. § 31-71e (prohibiting an employer from withholding wages except in five circumstances not applicable here). Both issues can be resolved by evidence common to all members of the class.

I find that Nizeul can prove her claims for wages and tips allegedly owed to Performers with common evidence. Defendants admit that ICF does not pay Performers for time spent in the free chat. ECF No. 42 ¶ 18. Defendants maintain records for each Performer's total minutes paid

17

and total paid minutes online, providing common evidence of whether Performers were compensated at a wage below that required by the CMWA. *Id.* at ¶ 19. Defendants have also produced records that track the amount of Gold transactions each Performer earned while livestreaming, including the purpose of the transaction (whether for purchasing content or a one-time discretionary payment), and the percentage the Defendants withheld. ECF No. 60-7 at 10–11. Further, whether Gold payments constitute discretionary gratuities belonging to the Performers under Connecticut law turns, at least in part, on uniform contractual terms and Defendants' standardized practices, which are susceptible to classwide proof through Performer Agreements and testimony concerning company policy. *See* ECF No. 72 at 10–11 (citing testimony of Defendants' corporate representative and Defendants' website and public documents calling Gold a "tip" and "bonus"). These records and testimony constitute common proof of whether Performers were compensated below the relevant minimum wage and whether Defendants unlawfully withheld their tips.

Defendants' arguments against predominance for Nizeul's wage and tip claims largely concern the calculation of damages. Defendants first contend that individualized inquiries are necessary to determine which streaming hours occurred in Connecticut, as Performers may stream from any location and the CMWA covers only hours worked in Connecticut. ECF No. 71 at 30. They further argue that this determination will be overly burdensome because they lack precise geolocation data for every stream. *Id.* at 30 & n.10. However, Performer's streaming locations *are* knowable to Defendants through common methods, including the tracking of internet protocol (IP) addresses. *Tomasello v. ICF Tech., Inc.*, 2025 WL 1177718, at *12 (D.N.J. Apr. 23, 2025) (finding that the same Defendants admitted to possessing Performers' IP addresses in a companion case). In any event, this argument goes to the calculation of damages, not liability, and the need to make

18

individualized damages calculations does not defeat class certification. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) ("While the question of how many hours each individual class member worked, including from home, is relevant to proving class members' individual damages, it is 'well-established' that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification.'").

Defendants also argue that individualized inquiries are necessary to determine the compensation each Performer received for the purposes of liability under the CMWA. ECF No. 71 at 31–32. Defendants contend that the Court will need to "individually assess each performer to determine lost wages (if any)," and that Nizeul "has not pointed to common evidence that proves all class members did not receive minimum wage for all hours worked per week," so she has not satisfied the predominance requirement. *Id.* I disagree. Although the precise amount of compensation each Performer received will vary, the method of proof is common because Defendants maintain records of the total minutes Performers were online and the total minutes they were in the paid chat, and the total amount of compensation each received. ECF Nos. 42 ¶¶ 18–19; 60-7 at 6–7. Defendants' compliance with the CMWA may be assessed by comparing total compensation paid during a given period to total hours worked to calculate an effective hourly rate. Any shortfall can therefore be determined through a standardized formula applied across the class. As with the geolocation argument, the precise calculation of damages among class members is not a barrier to class certification. *See Roach*, 778 F.3d at 405.

Finally, with respect to Nizeul's tip claim, Defendants argue that individualized inquiries are necessary to distinguish Gold transactions that constitute discretionary tips from those that constitute direct payments for a service or product. ECF No. 71 at 32. In other words, Defendants argue that because Gold is the vehicle through which all customer payments are made on

19

Streamate, individualized inquiries are necessary to determine which Gold transactions constitute discretionary tips. Again, this argument goes to damages, not liability, and does not defeat predominance. Defendants acknowledge that revenue from Gold transactions is shared between Streamate and the Performers, and that Streamate retains sixty-five percent of all such transactions. ECF No. 42 ¶ 35. Defendants' own materials referred to Gold payments as "tips" until 2021, and Performer testimony confirms that customers made Gold payments simply to show appreciation rather than in exchange for a specific service. ECF No. 72 at 10–11 (citing testimony of Defendants' corporate representative and Defendants' website and public documents calling Gold a "tip" and "bonus" and Plaintiff's testimony regarding experience on Streamate indicating that Gold is a tip). Whether Defendants' across-the-board retention of those payments violates Connecticut law is a question that turns on uniform contractual terms and standardized company practices, not the circumstances of any individual transaction. Any variation in the amount owed to individual Performers as a result of that determination is a question of damages that does not preclude a finding of predominance. *Roach*, 778 F.3d at 405.

Accordingly, Nizeul's wage and gratuity claims are capable of resolution through common evidence, and individualized issues concerning damages do not predominate over common questions of liability.

### 2) *Superiority*

Rule 23(b)(3) also requires Nizeul to show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority inquiry is "explicitly comparative in nature" and requires the Court to evaluate a class action against "other available methods" of adjudication. *In Re Petrobras*, 862 F.3d at 268. In assessing superiority, the court considers "four factors—individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability." *Sykes v. Mel S.*

*Harris and Associates LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (citing Fed. R. Civ. P. 23(b)(3)). Of these factors, "manageability is, by . . . far, the most critical concern." *Id.* (internal quotation marks omitted).

The proposed class is manageable. The anticipated class size of approximately 132 members, ECF No. 60-1 at 20, is modest and administratively feasible. Questions concerning Defendants' control over Performers and alleged wage and tip violations are governed by uniform agreements and company-wide policies applicable to all class members. Defendants maintain centralized records reflecting each Performer's free chat time, total minutes online, Gold received, and percentage withheld, from which damages can be calculated through a standardized formula applied uniformly across the class. ECF Nos. 42 ¶¶ 18–19; 60-7 at 10–11. To the extent individual records or testimony may be relevant, that does not render the action unmanageable.

Defendants contest superiority solely on the grounds that the class is unmanageable, arguing that resolution would require "individualized and fact-intensive inquir[ies]" into Defendants' control over Performers and into compliance with minimum wage requirements. ECF No. 71 at 32. However, the common questions involved in adjudicating both the ABC test and wage and tip liability predominate over any individualized issues. And to the extent damages require individual calculations, that alone is not a basis to deny certification.

The remaining Rule 23(b)(3) factors also favor class treatment. There is no indication that putative class members have a strong interest in controlling separate actions, particularly where potential individual recoveries may be modest relative to litigation costs. The Court is not aware of any parallel litigation brought by class members on these claims. Further, concentrating the litigation in this forum promotes judicial economy and ensures consistent adjudication of common

legal questions under Connecticut law. Balancing the Rule 23(b)(3) factors, the Court concludes that the superiority requirement is satisfied.

## VI.    Conclusion

For the reasons stated above, the Court GRANTS the plaintiffs' motion for class certification, ECF No. 60. The Court appoints the named plaintiff Shana Nizeul as class representative and appoints her attorneys as class counsel.

IT IS SO ORDERED.

/s/  MICHAEL P. SHEA
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              March 18, 2026